

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. WR-78,986-01

### EX PARTE DARRELL LYNN COCKRELL, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 1184 IN THE 31ST DISTRICT COURT
### FROM LIPSCOMB COUNTY

ALCALA, J., delivered the opinion of the Court in which MEYERS, WOMACK, JOHNSON, and COCHRAN, JJ., joined. KELLER, P.J., filed a dissenting opinion in which KEASLER and HERVEY, JJ., joined. PRICE, J., dissented.

### O P I N I O N

Despite the mandatory requirement in the Texas Code of Criminal Procedure guaranteeing an interpreter for deaf defendants, none was provided for Darrell Lynn Cockrell, applicant, who was unable to understand a substantial portion of the proceedings at his jury trial. *See* TEX. CODE CRIM. PROC. art. 38.31. In this application for a post-conviction writ of habeas corpus, applicant contends that his trial counsel rendered constitutionally ineffective assistance by failing to seek accommodations for his deafness. He further contends that, as a result of counsel's errors at trial, he was deprived of his constitutional rights to confront the witnesses against him, to understand the nature and

substance of the trial proceedings, and to assist in his own defense. *See* U.S. CONST. amends. VI, XIV. We agree with applicant and conclude that trial counsel's failure to request an interpreter constituted deficient performance and that applicant was prejudiced as a result of counsel's error. We, therefore, grant relief and remand this cause to the trial court for a new trial.

## I. Background

Around twelve years before his trial, applicant started to experience hearing loss due to chronic illness. By the time of his trial for aggravated sexual assault of a child in 2009, he suffered from bilateral severe hearing loss, wore the strongest hearing aids available, and was, in his own assessment, "pretty good" at reading lips. He was also starting to learn sign language.

Despite being aware of applicant's hearing impairment, trial counsel did not request an interpreter or special equipment to assist applicant in understanding the trial proceedings. The record indicates that, during the guilt/innocence phase of trial, counsel referred to applicant in passing as being "hard of hearing" and later, in the course of cross-examining a witness, stated his belief that applicant is "legally deaf."[1] Additionally, the record shows

---

[1] At the guilt/innocence phase, the record contains the following exchange during the complainant's testimony:

[Defense Counsel]: Okay. Is your dad very hard of hearing?

[Complainant]: Sometimes.

(continued...)

that, at one point during trial, defense counsel asked the judge if he could turn up the volume on the witness-stand microphone because applicant was having trouble hearing the complaining witness, to which the judge responded that the volume was already "up as high as it will go."

In the punishment phase of trial, trial counsel called applicant to testify. Trial counsel explained to the judge that applicant was "very hard of hearing" and that was why counsel was "yelling." The trial judge replied, "I know," acknowledging that, by that point in the trial, he had become aware of applicant's condition. During his testimony, applicant answered many of the questions posed by the attorneys with a question seeking to confirm the content of what he had been asked.

After applicant was sentenced, new counsel filed a motion for new trial alleging that applicant was hearing impaired, that he had been unable to effectively communicate with his trial counsel or hear witness testimony, and that he had been unable to adequately assist in his own defense. At the hearing on the motion for new trial, applicant testified that he had

---

[1](...continued)

    [Defense Counsel]: He's almost—I think he's legally deaf. Do you know that, whether or not he's legally deaf?

    [Complainant]: I don't know, sir.

    [Defense Counsel]: Okay. You know you have to yell in his presence for him to hear you; is that correct?

    [Complainant]: Yes, sir.

heard "none of" or "very little" of the trial proceedings. He stated that he had been hearing impaired for twelve or thirteen years and, in spite of wearing hearing aids, he was nevertheless unable to hear and understood others solely by reading lips. Applicant told the court, "If I turn my back to you, I cannot—if I'm not looking at you, I can't understand you." Applicant stated that, during his testimony in the punishment phase of trial, he "didn't understand" most of the questions and "had to have them repeated several times." He also produced evidence of his medical doctor's diagnosis that he had "bilateral severe hearing loss."

After the motion for new trial was denied, applicant did not complain on direct appeal that the trial court had erroneously denied the motion. *See Cockrell v. State*, No. 07-09-0233-CR, 2010 WL 1705538 (Tex. App.—Amarillo Apr. 28, 2010, pet. ref'd) (mem. op., not designated for publication). The challenge to the ineffectiveness of applicant's trial counsel is presented for the first time in this application for a post-conviction writ of habeas corpus. We previously remanded the application to the trial court to enter findings of fact and conclusions of law. *See Ex parte Cockrell*, No. WR-78,986-01, 2013 WL 841558 (Tex. Crim. App. Mar. 6, 2013). After receiving those findings and conclusions, we filed and set this application for further consideration of applicant's ineffective-assistance claim.[2] We

---

[2]   The habeas court made nineteen findings of fact, all of which are quoted in their entirety in the portion of the opinion to which they are applicable. We note, however, that four of these findings are immaterial to the resolution of the claims raised in this application:
•   The first finding states, "On June 17, 2009, a hearing was held on Defendant's First Amended Motion for New Trial predicated on the Defendant's allegation that he could not
(continued...)

grant relief.

## II. Trial Counsel Was Ineffective

Knowing that applicant was deaf, trial counsel failed to request the hearing assistance guaranteed by the Texas Code of Criminal Procedure, and this failure deprived applicant of his right to understand the nature of the trial proceedings, to assist in his own defense, and to confront the witnesses against him. *See* TEX. CODE CRIM. PROC. art. 38.31; U.S. CONST. amends. VI, XIV. Applicant contends that this failure by counsel constituted ineffective assistance of counsel under the familiar standard set out in *Strickland v. Washington*, which

---

(...continued)
hear during the trial of this cause due to his alleged hearing impairment which prevented him from adequately assisting Defense counsel during jury trial in this cause." The second finding states, "Defendant testified at the June 17, 2009, hearing on Defendant's First Amended Motion for New Trial." These findings are immaterial because they do not contain any finding as to whether the habeas judge believed the allegations in applicant's motion or his testimony and are merely background information about the case.

• Finding number thirteen states, "Defendant did not request the Court to move him around during trial so he could better read lips or ask for any accommodations/assistance to assist him in hearing the testimony or proceedings." This finding is immaterial because the issue in this application is trial counsel's ineffectiveness in representing applicant rather than applicant's actions in failing to take steps to represent himself by directly communicating with the trial court to ensure that his rights were protected. Nonetheless, the record clearly shows that applicant complained to counsel that he could not hear the testimony of the complaining witness.

• Finding number fifteen states, "There was never any testimony presented regarding any hearing impairment during trial." This finding is immaterial in that the pertinent questions for purposes of deciding whether trial counsel was ineffective are (1) whether applicant had a hearing impairment that made him unable to understand the proceedings, (2) whether trial counsel provided effective assistance to ensure that applicant could understand the proceedings, and, if not, (3) whether applicant was prejudiced by counsel's inaction. Trial testimony describing an impairment is not required to establish any of the above. Nonetheless, this finding is not supported by the record because, as shown in footnote one above, there was testimony at trial describing applicant's hearing impairment.

requires a showing that counsel's performance "fell below an objective standard of reasonableness" under prevailing professional norms and that applicant was prejudiced as a result of counsel's unreasonable conduct. 466 U.S. 668, 680, 690-94, 104 S. Ct. 2052 (1984). Applying this standard, we conclude that trial counsel's representation in this case fell below an objective standard of reasonableness based on his failure to request an interpreter and that applicant was prejudiced as a result of counsel's errors. *See id.* at 690, 694; *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011); *Hernandez v. State*, 988 S.W.2d 770, 770 n.3 (Tex. Crim. App. 1999).

In determining whether applicant has established that his counsel was ineffective, we apply the procedural law applicable to writs of habeas corpus. This Court is the "ultimate factfinder" in habeas proceedings. *See Ex parte Flores*, 387 S.W.3d 626, 634–35 (Tex. Crim. App. 2012); *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008). But we defer to the habeas court's fact findings that are supported by the record. *See Flores*, 387 S.W.3d at 634–35; *Reed*, 271 S.W.3d at 727. When, however, our "independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record, we may exercise our authority to make contrary or alternative findings and conclusions." *Reed*, 271 S.W.3d at 727.

**A. Counsel's Failure To Request Interpreter Constituted Deficient Performance**

To satisfy the deficient-performance prong of *Strickland*, an applicant must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable

professional judgment." *Strickland*, 466 U.S. at 690. A reviewing court must then determine whether counsel's assistance was outside the range of professionally competent assistance, "considering all the circumstances." *Id*. at 688-89. Judicial scrutiny of counsel's performance must be highly deferential. *Id*. at 689. To establish deficient performance under these particular circumstances, applicant must demonstrate that he was entitled to the assistance of an interpreter and that the trial court would have erred in overruling an objection from counsel on that basis. *See Martinez*, 330 S.W.3d at 901 (to demonstrate deficient performance based on failure to object, "applicant must show that the trial judge would have committed error in overruling such an objection").

**1. Trial Court Would Have Erred in Overruling Request for Interpreter**

Applicant is deaf as that term is defined by the Texas Code of Criminal Procedure, which states,"'Deaf person' means a person who has a hearing impairment . . . that inhibits the person's comprehension of the proceedings or communication with others." TEX. CODE CRIM. PROC. art. 38.31(g)(1). By using the word "inhibits," the Code does not require that a person suffer from complete hearing loss, but, as that word is commonly understood and as taken in context, instead means that the impairment must have operated to limit the range or extent of a person's hearing to the point that it affected his comprehension or communication. *See id*. art. 38.31(a), (b), (g)(1); AMERICAN HERITAGE DICTIONARY 699 (3d ed. 2000) (defining inhibit as "[t]o hold back; restrain" as well as "[t]o decrease, limit, or block the action or function of").

Applicant's medical doctor described applicant as having "bilateral severe hearing loss." That loss of hearing limited applicant's comprehension of and communication during the trial proceedings, as demonstrated by the trial record, which shows that (1) he complained that he could not hear a witness's testimony, (2) counsel had to yell his questions to applicant during applicant's testimony in the punishment phase of trial, and (3) applicant answered many questions during his testimony by first confirming the content of the inquiry.

Although he did not make any specific finding as to whether he believed applicant was a "deaf person" as that term is defined in the Code, the habeas judge did implicitly determine that applicant was deaf. In his findings of fact, the habeas judge stated that applicant can read lips and has done so since he "started becoming deaf," and he also found that "hearing aids help [applicant] with understanding word [enunciation]."[3] Based on these findings and our independent review of the record, we conclude that applicant had significant hearing loss that required him to use such supplemental techniques as hearing aids and lip reading, and, as such, was a "deaf person" as that term is defined in the Code. *See* TEX. CODE CRIM. PROC. art. 38.31(g)(1).

---

[3]     Finding number four states, "Defendant can read lips and has done so ' . . . since I (he) started becoming deaf.'"  Furthermore, the habeas court's finding number five states, "Hearing aids help the Defendant with understanding word [enunciation]."  These findings, which are supported by the record, show that the habeas court did believe that applicant was deaf and that he relied on reading lips and hearing aids to help him understand words.  The habeas court's findings are silent with respect to the degree to which the hearing aids would have helped applicant understand witness testimony.  By limiting its factual findings to a statement that the hearing aids served to "help" applicant in understanding word enunciation and by finding that applicant could read lips, the habeas judge essentially found that applicant was only able to understand words through a combination of hearing aids and lip reading.

If it is notified that a defendant is deaf, a trial court is statutorily and constitutionally obligated to provide an interpreter for that individual. *See* TEX. CODE CRIM. PROC. art. 38.31(a) (providing that, "If the court is notified by a party that the defendant is deaf . . . the court shall appoint a qualified interpreter[.]"). Furthermore, the trial itself would not have been able to commence until the trial court had provided an interpreter within ten feet or less from applicant and in his full view. *See id.* art. 38.31(d) ("A proceeding for which an interpreter is required to be appointed under this Article may not commence until the appointed interpreter is in a position not exceeding ten feet from and in full view of the deaf person."). Additionally, the trial court's duty to appoint an interpreter is mandatory unless the deaf defendant affirmatively waives one. *See id*. art. 38.31(a). This statutory provision serves to safeguard a hearing-impaired defendant's constitutional right of confrontation. *See Garcia v. State*, 149 S.W.3d 135, 145 (Tex. Crim. App. 2004) (discussing analogous requirement as it applies to language translators and noting that "the accused's right to be present in the courtroom during his trial" is "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause" and includes the right to understand the testimony of the witnesses).[4] We, therefore, conclude that applicant would have been entitled to a deaf

---

[4] *See also Linton v. State*, 275 S.W.3d 493, 501 (Tex. Crim. App. 2009) (describing purpose of Article 38.31 as "implement[ing] the constitutional right of confrontation, which includes the right to have trial proceedings presented in a way that the accused can understand") (citing TEX. CODE CRIM. PROC. art. 38.31(a), (b)); *United States v. Lin*, 794 F.2d 469, 470 (9th Cir. 1986) (noting that "a defendant whose fluency in English is so impaired that it interferes with his right to confrontation or his capacity, as a witness, to understand or respond to questions has a constitutional right to an interpreter").

interpreter had counsel properly requested one, and that the trial court would have erred in overruling an objection from counsel raising the issue of the lack of an interpreter. *See Martinez*, 330 S.W.3d at 901.

**2. Trial Counsel's Performance Fell Below Objective Standard of Reasonableness**

A reasonably competent attorney would have realized that applicant's condition met the definition for "deaf person" as that term is defined in the Code and should have requested the assistance mandated by the Code. The Code mandates that, upon being advised that a defendant is deaf, a trial court "shall appoint a qualified interpreter." TEX. CODE CRIM. PROC. art. 38.31(a), (b). The Code defines a qualified interpreter as "an interpreter for the deaf who holds a current legal certificate issued by the National Registry of Interpreters for the Deaf or a current court interpreter certificate issued by the Board of Evaluation of Interpreters at the Department of Assistive or Rehabilitative Services." *Id*. art. 38.31(g)(2). Interpreters may communicate with a deaf person by sign language or any other form of communication, including but not limited to "finger spelling, lip reading, written communication, or stenographers to provide simultaneous transcriptions, or a combination of these methods, depending [on] a person's proficiency in the different systems of communication." *See id*. art. 38.31(a), (b); *Linton v. State*, 275 S.W.3d 493, 501 (Tex. Crim. App. 2009).

Instead, as found by the habeas court:

- "During trial, trial counsel did not request the court to accommodate or

> provide assistance to assure that Defendant could hear the proceedings."

- • "Trial counsel did not request the Court to move Defendant around during trial so he could better read lips or ask for any accommodations/assistance to assist him in hearing the testimony or proceedings."

- • "No requests were made and the Court was never asked to accommodate any hearing impairment prior to or during trial."[5]

According to the habeas court's findings of fact, the "only apparatus or equipment utilized at trial to assist Defendant in communicating with his trial counsel was a pen and paper."[6] Furthermore, as found in the habeas court's findings, because of counsel's failures, applicant was unaware that he was entitled to more than just pen and paper to assist him with his hearing impairment.[7] We conclude that counsel's failures collectively constitute deficient performance because a reasonably competent attorney would have requested an interpreter, who in turn would have ensured that applicant could understand the trial proceedings through use of special equipment, a stenographer, or a real-time court reporter.

The habeas court's findings and the habeas record clearly indicate that trial counsel was well aware of applicant's hearing impairment and his inability to hear witness testimony

---

[5]   These findings are numbers eleven, twelve, and sixteen.

[6]   Finding nine states, "The only apparatus or equipment utilized at trial to assist Defendant in communicating with his trial counsel was a pen and paper which he did utilize to communicate with trial counsel's paralegal who sat between Defendant and his trial counsel." Finding seventeen states, "Defendant was taking notes and exchanging notes with trial counsel and his staff during trial."

[7]   Finding number fourteen states, "Defendant did no[t] know hearing assistance devices were available from the Court to assist his hearing during the trial."

at trial.[8] The record shows that during his cross-examination of the complaining witness,

counsel acknowledged, "I think he's legally deaf." In his affidavit before the habeas court,

counsel stated,

> I was aware [applicant] had a hearing problem, however, I was always able to communicate with him. It may be that I didn't know the extent of [applicant's] hearing problem because he read my lips when we communicated and I did not know he was doing so. Because of this, I did not make arrangements to have a hearing assistance available at trial. It was not until the first break at trial that I became aware [applicant] could not hear the witness (accuser). I believe we tried to get the Court to help by turning the microphone on or having the witness speak up. . . .
>
> During [applicant's] trial, I tried to ensure that he be able to hear the testimony of witnesses so that he might assist in his own defense. Only [applicant] can speak as to how much he heard of the trial after the first break.
>
> Relying in part on counsel's affidavit, the habeas court found that "[d]uring trial, trial

---

[8]  Finding number seven states, "Trial counsel was aware that Defendant had a hearing problem, however, trial counsel was always able to communicate with Defendant." Finding number eight states, "At the first break during trial, trial counsel was informed by Defendant that Defendant could not hear the witness." These findings show that the habeas court believed that trial counsel was aware of applicant's hearing problem and that applicant did, in fact, complain to his attorney that he was unable to hear witness testimony. With respect to the portion of the seventh finding that refers to trial counsel's ability to communicate with applicant, that portion is largely immaterial to the issue in this application because it addresses a different matter than whether applicant could understand the trial proceedings. Although applicant may have been able to read counsel's lips during their meetings, common experience tells us that this communication would have had to occur at a close distance with the two in close proximity. That situation is a far cry from what goes on in a courtroom, where a defendant sits at counsel table a distance apart from a testifying witness, who usually faces the attorney asking the questions or the jury, rather than the defendant. It is, therefore, implausible that a deaf defendant seated at counsel table at a significant distance from the witness stand would be able to read a witness's lips at trial without the aid of a certified interpreter to assist in that capacity. That is precisely why the Code sets out a mandatory duty for the appointment of a certified interpreter to be located within view of and ten feet or less from a deaf defendant in court. *See* TEX. CODE CRIM. PROC. art. 38.31(d). The habeas judge's focus on applicant's ability to communicate with his trial counsel misunderstands the nature of applicant's complaint, which focuses on his inability to understand witness testimony and to participate in his own defense.

counsel tried to ensure" that applicant was able to "hear the testimony of witnesses so that [applicant] might assist in his own defense."[9] This finding appears to refer to trial counsel's actions in using written notes to communicate with applicant, asking the trial court to turn up the volume on the witness-stand microphone, and yelling. But these measures were inadequate and ineffectual. In analogous situations involving a defendant who was unable to directly comprehend the substance of the trial proceedings, the use of written notes has been held to be constitutionally inadequate. *See Ferrell v. Estelle*, 568 F.2d 1128, 1133 (5th Cir. 1978) (use of notes for communication violated constitutional right to understand proceedings), *withdrawn on death of defendant*, 573 F.2d 867 (5th Cir. 1978); *Adams v. State*, 749 S.W.2d 635, 639 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) (use of written notes from defense counsel to communicate with deaf defendant violated defendant's constitutional right to understand witnesses and assist in his own defense). Furthermore, applicant's testimony at the hearing on the motion for new trial indicates that note-passing

---

[9]     Finding number nineteen states, "During trial, trial counsel tried to ensure that Defendant was able to hear the testimony of witnesses so that he might assist in his own defense." This finding is largely immaterial in that, even though it may be true that counsel "tried to ensure" that applicant could hear, that does not answer the question whether counsel was objectively unreasonable in his efforts. Furthermore, this finding must be examined in light of the other, more specific findings describing what counsel actually did. According to the habeas court's findings numbers nine, eleven, twelve, and sixteen, which are quoted above and which are reflected in the trial record, counsel's efforts at accommodation consisted of providing applicant with a pen and paper at trial, yelling, and asking that the microphone be turned up. Those measures were ineffective at assisting applicant with understanding witness testimony, for which the only effective solution under these circumstances would have been to seek the appointment of a deaf interpreter, as required by the Code. The habeas court's finding that trial counsel "tried" is no evidence that trial counsel was objectively reasonable in his efforts.

was inadequate to apprise applicant of the status of the proceedings and the content of witness testimony because when applicant would ask a question of counsel in writing regarding what a witness had said, counsel and his assistant "would just say, everything's fine . . . no questions were answered that [applicant] asked." Applicant's habeas affidavit similarly asserts that, in spite of counsel's minimal efforts, applicant was unable to understand the substance of the trial proceedings. Applicant states,

> During the trial of my case, . . . [t]he courtroom acoustics created such echos [sic], I could not hear any of the testimony from the stand during my trial. I only learned of what was said on the stand at days end when people in the courtroom for the testimony would give me a summary of the testimony for the day.

> I told my attorney I could not hear anything in the courtroom. He did absolutely nothing to assist me to hear my trial. My trial attorney told me he would make sure everything was written down for me, but nothing was written down or communicated to me about the testimony that was occurring.

The habeas-court judge did not make any specific finding to address whether he believed applicant's testimony describing his inability to hear witness testimony. The habeas court did make two narrowly drawn findings that applicant could understand proceedings in two specific circumstances, but neither of these or any other findings determined that applicant could understand witness testimony at his trial or at any other proceedings. The habeas court narrowly found that applicant could understand the questions asked of him by

the district attorney during his jury trial.[10] Additionally, the habeas court narrowly found that

applicant participated in the hearing on the motion for new trial without assistance.[11] Neither

---

[10]     Finding number ten states, "Defendant did not have difficulty understanding most of the District Attorney's questions during trial." This finding pertains only to the applicant's ability to hear the questions asked by a single attorney during his own testimony at the trial through face-to-face communication with the attorney. That is a different question from whether he understood testimony from testifying witnesses. There is no finding that the defendant could hear any of the answers by the witnesses nor that he could hear the questions by the attorneys to those witnesses. Because the witnesses likely faced either the attorney asking the questions or the jury and the witnesses on the witness stand would not have been in close proximity to applicant, the fact that applicant could understand attorney questions that were directly asked of him has little value in deciding this case. The finding that applicant could hear the questions asked by the attorneys when he testified cannot be characterized as a finding that applicant understood any of the other testimony during the trial. In any event, the record does not support these findings by the habeas court. The record shows that during applicant's testimony, many of his answers to his attorney's and the prosecutor's questions suggest that he did not fully hear the questions. The record includes multiple examples:

- When his attorney asked, "What did you say about how you've raised Steven? What did you just say?" Applicant responded, "How—how did I raise Steven?"
- Applicant's attorney asked, "Now, when [the complainant] made the allegations and told her mom and Steven found out about it, he came over then and beat you up; is that right?" Applicant responded, "Excuse me?"
- Applicant's attorney asked, "Now, when you first came to see me, ya'll came to see me in my office, he was going to college; is that right?" Applicant responded, "I'm sorry?"
- The prosecutor asked, "Mr. Cockrell, you were in court every day that we were here, weren't you?" Applicant responded, "I'm deaf."
- The prosecutor asked, "You're aware, aren't you, Mr. Cockrell, that they have medical facilities in TDC?" Applicant responded, "I need you to say that again."
- The prosecutor asked, "It's your testimony today that you absolutely refused to take responsibility for what you did to your daughter. Isn't that true?" Applicant responded, "Excuse me?"

Applicant's responses demonstrate that he was unable to understand many of the questions, which had to be repeated even though applicant wore hearing aids, his attorney was yelling the questions at him, and he likely would have been face-to-face with the attorney asking the questions.

[11]     The habeas court's third finding states, "Defendant testified at the June 17, 2009, hearing without difficulty and without hearing assistance." This finding is also narrowly drawn to address

(continued...)

finding addresses applicant's present complaint, which relates to his inability to understand witness testimony and participate in his defense. Furthermore, the habeas court also found that, at trial, applicant wore hearing aids that served to "help" him understand word enunciation, but this finding has little value in deciding the issues in this application because the habeas court fails to describe the extent to which the hearing aids helped applicant.[12]

_____

(...continued)
applicant's ability to hear questions directly asked of him during the hearing on the motion for new trial, but it does not speak to whether applicant could understand the proceedings at his jury trial. In any event, this finding is not supported by the record. On at least five occasions, applicant's answers at the hearing demonstrate that he had trouble understanding the proceedings, as follows:

> (1) His counsel asked, "So you didn't understand everything that was happening because of your hearing impairment?" to which applicant answered, "Do I understand everything you say?"
> (2) The prosecutor asked, "During the trial did you ever request to the Court to move you around so you could better read lips or ask for any accommodations?" Applicant answered, "I—did I ask for any accommodations?"
> (3) The prosecutor asked applicant, "But no request was ever made to the Judge in that case regarding—no request was ever made to the Judge to accommodate your hearing impairment; correct?" Applicant answered, "I don't."
> (4) The prosecutor asked applicant, "And you were communicating with your attorney throughout the—throughout the trial through handwritten notes?" Applicant answered, "Again."
> (5) The prosecutor asked, "I said you were communicating with your attorney throughout the trial with handwritten notes; correct?" Applicant answered, "Communications with my lawyer?"

The record affirmatively shows that applicant was unable to understand many of the questions posed at the hearing on the motion for new trial. Consequently, the habeas court's assessment that applicant testified without difficulty at this hearing is unsupported by the record.

[12] Finding number five states, "Hearing aids help the Defendant with understanding word [enunciation]." Finding number six states, "Defendant was wearing hearing aids during this trial of this cause." The habeas court does not further describe what it means by "help." The habeas court does not find that the hearing aids corrected applicant's hearing impairment to the point that he could understand most or all of the proceedings. Rather, at best, the word "help" suggests that the hearing

(continued...)

Something may help but still be inadequate. No finding determined that the hearing aids served the purpose of enabling applicant to adequately understand testimony.

The habeas court's eighteenth finding states, "This Court never detected that Defendant was having any issue with hearing the testimony and proceedings during trial." The habeas court, however, mistakenly focused on whether the trial court should have realized that applicant had a hearing impairment, which is pertinent when the complaint relates to whether the trial court committed error by failing to appoint an interpreter. *See Salazar v. State*, 93 S.W.3d 339, 341 (Tex. App.—Texarkana 2002, pet. dism'd) (trial court did not commit error by failing to appoint interpreter because trial court was not made aware of person's inability to hear proceedings); *Lincoln v. State*, 999 S.W.2d 806, 809–10 (Tex. App.—Austin 1999, no pet.) (same). Even accepting the habeas court's finding that it never detected applicant's hearing problems at trial, that does not answer the separate question of whether trial counsel was ineffective for failing to request an interpreter or other accommodations for applicant's hearing loss. *See Gonzalez v. Philips*, 195 F. Supp. 2d 893, 899 (E.D. Mich. 2001) (finding counsel was ineffective for failing to request interpreter even though trial court was unaware of defendant's inability to understand English). The record conclusively shows that trial counsel was aware of applicant's hearing loss and made ineffectual efforts to address the problem instead of invoking the mandatory provisions in

---

(...continued)
aids made the situation better but did not solve the problem. Furthermore, in its fourth finding, the habeas court found that applicant would read lips as a measure to help him understand words, suggesting that applicant relied on both hearing aids and lip reading to understand others.

the Code. Importantly, though he expressly finds that he never detected that applicant was having a problem, which is unnecessary for deciding the question whether trial counsel was ineffective, the habeas-court judge never makes any finding that applicant could understand the jury-trial proceedings and witness testimony, which is the question that is material in deciding whether trial counsel was ineffective and whether applicant was prejudiced as a result of counsel's errors.

More than thirty years ago, this Court stated that a deaf defendant must be provided adequate interpreting services at trial in order that he may "assist his counsel" and "be aware of the proceedings." *Ex parte Tijerina*, 571 S.W.2d 910, 911 (Tex. Crim. App. 1978). Expounding on this principle, it stated,

> To proceed with a hearing when the accused is [hearing impaired] without interpreters is to deny the accused the right to a fair opportunity to defend against the State's accusations mandated by the U. S. Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297. *See Ferrell v. Estelle*, 568 F.2d 1128 (5th Cir. 1978). Clearly, a deaf [defendant] is denied the right to assist in his own defense unless afforded the benefit of interpreters to keep him informed of what is transpiring in the course of the proceeding.

*Id*. at 912. Here, trial counsel was aware that applicant was unable to hear or understand the trial proceedings, but made no meaningful effort to seek accommodations to ensure that applicant's constitutional rights were protected. This situation is, therefore, distinguishable from similar situations in which an attorney's performance has been found adequate despite his failure to request an interpreter because, in those cases, the record reflected that the attorney could reasonably have been unaware of the defendant's language and

comprehension difficulties. *See*, *e.g.*, *Gonzalez v. United States*, 33 F.3d 1047, 1051 (9th Cir. 1994) (attorney's failure to object to lack of interpreter not deficient performance because defendant "never indicated to the court that he was experiencing major difficulty," his answers to questions were "consistently responsive," record did not reflect any misunderstanding as a result of language barrier, and therefore it was not "likely that the alleged right [to an interpreter] should have been obvious to competent counsel"); *United States v. Vargas*, 871 F. Supp. 623, 625 (S.D.N.Y. 1994) (rejecting ineffective-assistance claim based on failure to request interpreter where defendant did not express need for interpreter to counsel at any time). It is also distinguishable from those cases in which a defendant said nothing at trial and complained of his inability to hear only after the fact. *See Valladares v. United States*, 871 F.2d 1564, 1566 (11th Cir. 1989) (rejecting ineffective-assistance claim in light of defendant's failure to "point to any instance in the record where he complained" about inadequate translation services, and noting that "[t]o allow a defendant to remain silent throughout the trial and then . . . assert a claim of inadequate translation would be an open invitation to abuse."). By contrast, here, the habeas court found that "trial counsel was aware that [applicant] had a hearing problem," and that counsel, during trial, "was informed by [applicant] that [applicant] could not hear the witness." This is, therefore, not a case in which counsel can reasonably claim that he was unaware of applicant's inability to comprehend the trial proceedings and witness testimony.

This case is analogous to the situation in *Gonzalez v. Phillips*, in which a federal

habeas court concluded that the defendant's trial counsel had rendered deficient performance by failing to request a language interpreter for a Spanish-speaking individual. *See* 195 F. Supp. 2d at 895-901. In that case, as in the present case, the defendant had indicated to his attorney at trial that "he did not understand what was happening" and "did not understand the proceedings," but trial counsel did not seek to have an interpreter appointed. *Id*. at 895. In finding trial counsel's performance deficient, the federal district court stated,

> In order to receive a fair trial and to assist in his own defense, a defendant must be able to understand the proceedings against him. If a defendant does not understand those proceedings and the defendant's attorney is aware or should be aware of the defendant's inability to understand the proceedings, it is incumbent upon that attorney to act on his or her client's behalf by requesting an interpreter.

*Id*. at 898-99. The federal district court concluded that the record "clearly show[ed]" that the defendant "had insufficient English language abilities to understand the proceedings against him and that his attorney was aware or should have been aware of his . . . limitations." *Id*. at 899. In short, the defendant's attorney was "on notice that his client had limited English language abilities" and, therefore, his "failure to obtain an interpreter [fell] outside the range of reasonably competent professional assistance." *Id*. at 900. We similarly conclude here that the record supports applicant's claim that his counsel knew that he was deaf and that he was unable to adequately understand the trial proceedings.[13] Counsel's failure to object to

---

[13]     In emphasizing that applicant's claim here is supported by specific facts in the record, we seek to distinguish this case from a situation in which the trial record is devoid of any specific facts supporting the defendant's claim that he was unable to hear or understand. We acknowledge that, as a general matter, it will be more difficult for an applicant to establish that his attorney was

(continued...)

the lack of interpreter, therefore, constitutes deficient performance. *See Strickland*, 466 U.S.

at 686; *see also Gonzalez*, 195 F. Supp. 2d at 899.[14]  On this basis, we conclude that counsel

was ineffective under the first prong of *Strickland*.  *See Strickland*, 466 U.S. at 686.

## B. Counsel's Deficient Performance Prejudiced Applicant

In addition to demonstrating that his attorney's performance fell below an objective

standard of reasonableness, an applicant for post-conviction relief who raises a claim of

ineffective assistance of counsel must also demonstrate that, but for counsel's errors, there

is a reasonable probability of a different outcome at trial.  *Id.* at 692-94; *see also Lafler v.*

---

(...continued)
unreasonable in failing to request an interpreter if the applicant is unable to point to specific instances in the record to support his claim.  *See Linton*, 275 S.W.3d at 509 (holding that trial court did not err by denying defendant's motion for new trial on basis of inadequate deaf-interpretation because the "record reflect[ed] that appellant understood the proceedings well enough to assist in her own defense; moreover, whatever communication difficulties might have existed between appellant and her trial counsel were not apparent in the record"); *see also Tuivailala v. State*, 277 P.3d 336 (Hawaii App. 2012) (rejecting ineffective-assistance claim based on counsel's failure to request interpreter because record reflected that defendant had a "very good" understanding of English language and was able to address the court in an "effective manner"); *Sanchez v. State*, 330 S.W.3d 847, 850 (Mo. App. 2011) (rejecting ineffective-assistance claim based on counsel's failure to request interpreter because defendant "failed to demonstrate that he was unable to fully comprehend" proceedings and attorney did not have problems communicating with him); *Chang Ming Lin v. State*, 797 N.W.2d 131 (Iowa App. 2010) (rejecting ineffective-assistance claim based on counsel's failure to procure interpreter because record demonstrated that defendant did not need an interpreter and "meaningfully participated" in proceedings); *United States v. Martinez*, 120 F. Supp. 2d 509, 514 (W.D. Penn. 2000) (holding counsel was not ineffective for failing to ensure an interpreter was present during meetings with defendant and for not providing defendant with written translations of court documents, where record reflected defendant's ability to communicate and comprehend the proceedings in English).

[14]     In its first of two conclusions of law, the habeas court stated, "Trial counsel's performance at trial was not deficient as alleged by Defendant."  We review conclusions of law de novo.  *See Weinstein v. State*, No. WR-78,989-01, ___ S.W.3d ___, 2014 WL 300802, slip op. at *5-6 (Tex. Crim. App. Jan. 29, 2014).  As we explain more fully above, neither the habeas court's findings nor the record supports a legal conclusion that counsel's performance was not deficient.

*Cooper*, 132 S. Ct. 1376, 1384-85 (2012) (same). The Supreme Court has explained that the applicable prejudice standard goes to whether counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. In accordance with this principle, a reviewing court's adjudication of an ineffective-assistance claim should ultimately focus on "the fundamental fairness of the proceeding whose result is being challenged." *Id*. at 696. It further explained that a reviewing court "should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696. Recently, in *Lafler v. Cooper*, the Supreme Court explained that "'[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Lafler*, 132 S. Ct. at 1388.[15] The Court further noted that there are "instances . . . where a reliable trial does not

---

[15]    In *Lafler*, a favorable plea offer was reported to the client, but, on advice of counsel, was rejected. *Lafler v. Cooper*, 132 S. Ct. 1376, 1383 (2012). After "a full and fair trial before a jury" after which Lafler was found guilty, Lafler received a sentence harsher than that offered in the rejected plea bargain. *Id*. The sole issue was the prejudice standard that would apply under those circumstances because the case came to the Supreme Court "with the concession" that counsel's advice with respect to the plea offer fell below the standard of adequate assistance of counsel guaranteed by the Sixth Amendment. *Id*. The standard the court applied to determine whether Lafler was prejudiced required him to prove that "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id*. at 1385.

foreclose relief when counsel has failed to assert rights that may have altered the outcome." *Id*. The right to effective assistance of counsel, therefore, does not "attach[] only to matters affecting the determination of actual guilt," but also extends to those aspects of a criminal proceeding that ensure procedural fairness and reliability. *Id*. (citing *Kimmelman v. Morrison*, 477 U.S. 365, 380 (1986)). In generally discussing what the appropriate remedy should be for deficient performance by an attorney, the Supreme Court explained,

> Sixth Amendment remedies should be "tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." Thus, a remedy must "neutralize the taint" of a constitutional violation, while at the same time not grant a windfall to the defendant or needlessly squander the considerable resources the State properly invested in the criminal prosecution.

*Id*. at 1388-89 (citations omitted). With these principles in mind, we review the record to determine whether, but for counsel's errors, there is a reasonable probability of a different outcome at applicant's trial. *See Strickland*, 466 U.S. at 688. We conclude that applicant has adequately demonstrated that he was prejudiced as a result of counsel's failure to request an interpreter. *Id*.

Here the habeas record shows that "the injury suffered from the constitutional violation" was that applicant could not understand a substantial portion of the proceedings at his jury trial, and, therefore, could not adequately participate in his own defense during trial. *See Lafler*, 132 S. Ct. at 1388-89. To understand communication, applicant would both read the lips of the speaker and wear hearing aids that helped him. These combined measures were apparently sufficient to enable applicant to understand the speaker when the speaker

was both close enough and face-to-face with applicant to permit him to read the speaker's lips, and loud enough to permit him to hear some of the sounds. This is essentially what the habeas court determined in its findings of fact describing the three situations when applicant could understand the proceedings: (1) applicant could understand the questions posed to him by the district attorney during the applicant's testimony, (2) applicant could understand the questions asked of him at the motion-for-new-trial proceedings, and (3) applicant could understand his attorney during their discussions.[16] These three situations occurred when the speaker would have been close to applicant, face-to-face with him, and speaking in a loud voice. In contrast, the habeas court made no finding of fact that applicant could understand any witness, attorney, or judge at any other time. The absence of any finding of fact that applicant could understand witness testimony, in light of its other findings that address the times applicant could understand certain parts of the trial, suggests that the habeas court did not believe that applicant could understand witness testimony. And that is certainly what the entirety of the record reveals. It is evident from the trial record that applicant was unable to hear witness testimony at various points throughout the trial. The trial record shows that applicant complained to his attorney of his inability to hear the complaining witness and that the microphone was then turned up as high as it would go. The trial record shows that, at the

---

[16]     As detailed above, the record does not support the habeas court's findings with respect to applicant's ability to understand questions posed to him during his testimony, but, even accepting that he could understand those questions, the record shows that he was prejudicially deprived of an ability to understand the remaining substantial portion of the proceedings, including the substance of witness testimony.

beginning of trial counsel's examination of applicant at the punishment phase, counsel explained to the judge that the reason he was yelling was that applicant was "very hard of hearing." This explanation by trial counsel demonstrates that applicant had to be addressed in a very loud tone, much louder than that required for other witnesses, in order for him to hear counsel's questions. It strains common sense to believe that applicant could hear the attorneys' questions and witnesses' answers throughout the trial at a normal, non-yelling volume, but, when applicant testified, trial counsel had to yell for applicant to hear the questions. Furthermore, it is highly probable that applicant was at a distance from the witness stand because courtrooms are designed to keep the witnesses apart from the defendant for security concerns. Common sense tells us that a witness would have faced the attorney asking the questions or the jury as the witness testified. Given that the witnesses would be a distance from him and not facing him, applicant's ability to read lips would be of little value in that situation. And, as discussed previously, applicant's hearing aids were ineffective at enabling him to hear what others were saying. Furthermore, had counsel merely asked for an interpreter, the trial court would have been required to provide an interpreter who could have translated the trial proceedings into "any language" that applicant could understand, "including but not limited to sign language." TEX. CODE CRIM. PROC. art. 38.31(a); *Linton*, 275 S.W.3d at 501. And the interpreter would have been required to stand at a distance not exceeding ten feet from and in full view of applicant to make sure that applicant could see the interpreter. Because applicant was deprived of the benefit of an

interpreter, he was unable to understand the witness testimony at his trial. We conclude that the habeas court's findings of fact and the habeas record demonstrate that applicant could not understand the testifying witnesses, and, therefore, could not participate in his own defense during a substantial portion of the proceedings at his jury trial. *See Lafler*, 132 S. Ct. at 1388-89.

Furthermore, in light of the nature of the evidence presented against applicant at trial, we find it is likely that, under these circumstances, had he been able to understand the proceedings, he would have been able to participate in his own defense in such a way as to influence the verdict. The evidence against applicant at trial primarily consisted of the testimony of his twelve-year-old daughter regarding allegations that he had sexually assaulted her. The complainant indicated in her testimony that applicant had "raped" her multiple times, but she also conceded that she had lied on several prior occasions about allegations of sexual abuse against others, and she stated that she had felt "pressured" by adults into saying things that weren't true. The complainant's mother, applicant's ex-wife, testified that the complainant had "extreme anger issues," was unmanageable, and "can tell stories that have nothing to do with the truth." The mother stated that the complainant had made similar allegations of sexual abuse against her two brothers but had recanted those allegations. The complainant's brother also testified that she was "not truthful at all." Other evidence included testimony from a sexual-assault nurse who testified that the complainant's vaginal area showed signs of some "trauma," but that the hymen was still intact. The State's expert,

a clinical psychologist who had reviewed the case file but had not personally met with the complainant, opined that, based on her review of the evidence in the case, the complainant had been sexually abused by someone.

On the whole, this appears to have been a close case in which the credibility of the complaining witness was the primary contested issue. Had applicant been able to understand the trial testimony, it is likely that he would have been able to advise counsel on possible ways of impeaching the complainant's trial testimony. Applicant has now filed affidavits in his habeas application from individuals who state that the complainant's version of the events could not have happened as she described because applicant was not alone with the complainant at the time of the alleged incidents of sexual assault. These witnesses were not called to testify at applicant's trial. We also note that applicant indicated in his habeas affidavit that he told counsel he wished to testify at trial, but counsel said he "would not put [applicant] on the stand" during the guilt phase "because he thought it would confuse the jury to[o] much for someone who could not hear to testify."[17]

Considering counsel's performance in light of all the circumstances and the evidence in the record, we conclude that applicant has made an adequate showing that, but for

---

[17]     Although it is not directly relevant to the allegations raised in this writ application, we further note that counsel's performance in this case was far from a model of professionalism. Having reviewed the record, we note that counsel was instructed multiple times by the trial judge to act professionally and to stop badgering witnesses. At one point, the State objected that counsel was badgering the complaining witness, who was twelve years old at the time of trial, to which counsel responded that the witness "deserved it." After this incident, the trial court threatened to hold counsel in contempt. At a bench conference after the close of evidence, the trial judge told counsel that he had been "very disrespectful."

counsel's errors at trial, there is a reasonable probability of a different outcome at trial. *See Strickland*, 466 U.S. at 688. Where a defendant has been unable to participate in his own defense during a substantial portion of the proceedings at his trial, he is deprived of "the fundamental fairness of the proceeding whose result is being challenged" and "a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. We hold that, by failing to assert applicant's rights to an interpreter to ensure that he could understand the testifying witnesses and participate in his own defense during a substantial portion of the trial, the result of this proceeding is unreliable because of "a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696; *see also Lafler*, 132 S. Ct. at 1388-89. We, therefore, conclude that the second prong of *Strickland* is met.

### III. Conclusion

It is well settled that, if a defendant cannot hear, fundamental fairness and due process of law require that an interpreter be provided. *Linton*, 275 S.W.3d at 500; *Tijerina*, 571 S.W.2d at 912. The federal Constitution "requires that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense." *Linton*, 275 S.W.3d at 500. Article 38.31 of the Code of Criminal Procedure implements the constitutional right of confrontation, which includes the right to have trial proceedings conducted in a way that the accused can understand. *Id*. at 501 (citing TEX. CODE CRIM. PROC. art. 38.31). It was trial counsel's responsibility to ensure that applicant's constitutional rights were not violated, and counsel wholly failed to do this. Because applicant has demonstrated that counsel's

performance was constitutionally deficient and that he was prejudiced as a result of counsel's errors, we grant relief and remand the case to the trial court for a new trial.

Delivered: March 12, 2014

Publish